

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-17-2005

# Fiadjoe v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-2917

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Fiadjoe v. Atty Gen USA" (2005). *2005 Decisions.* Paper 915.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/915

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

―――――――

Nos. 03-2917 & 04-1554

―――――――


LORRAINE FIADJOE

Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.



On Petition for Review of Orders of The
Board of Immigration Appeals
Agency Docket No. A77-943-716


―――――――


Argued November 19, 2004

Before: ROTH, SMITH, <u>Circuit Judges</u> and DEBEVOISE[*],
<u>Senior District Court Judge</u>

(Filed: June 17,  2005)

DAVID E. PIVER, ESQ. (Argued)
W. JOHN VANDENBERG, ESQ.
The Law Office of David E. Piver
150 Strafford Ave., Suite 115
Wayne, PA 19087

PETER D. KESSLER, ESQ.
Assistant Attorney General
Civil Division

TERRI J. SCADRON, ESQ.
Assistant Director

JEFFREY J. BERNSTEIN (Argued)
LESLIE McKAY
Attorneys
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, D.C. 20044

---

[*]  The Honorable Dickinson R. Debevoise, Senior United States District Judge for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

**Debevoise, Senior District Judge**

Petitioner, Lorraine Fiadjoe, petitions for review of orders of the Board of Immigration Appeals ("BIA") denying her application for asylum, withholding of removal and relief under the Convention Against Torture and denying her motion for reconsideration. With the exception of an eleven year interval, from 1978, when Ms. Fiadjoe was seven years of age, until her flight from her native Ghana to the United States in March 2000, Ms. Fiadjoe was held as a slave of her father, a priest of the Trokosi sect, who, in accordance with the tenets of the sect, forced his daughter to work for him and abused her physically and sexually. Ms. Fiadjoe sought asylum and other relief on the ground that if she were returned to Ghana she, as one of the women subject to the practices of the Trokosi sect, would likely once again become subject to her father's bondage and abuse, a consequence that Ghanian government authorities were unable or unwilling to prevent.

Both the Immigration Judge ("IJ") and the BIA found that Ms. Fiadjoe's testimony was not credible, and the BIA found that Ms. Fiadjoe failed to establish that the government of Ghana was either unwilling or unable to control her father's sexual abuse. We conclude that these findings are not supported by reasonable, substantial and probative evidence on the record considered as a whole. We will grant the petition and remand the case for a new hearing and development of the record before a different IJ.

## I. Procedural Background

3

On March 11, 2000, using a passport bearing the name of another person, petitioner, Lorraine Fiadjoe, entered the United States. She is a member of the Ewe tribe and a native and citizen of Ghana. She was detained as an arriving alien and interviewed. Upon her refusal to be sent back to Ghana, the immigration authorities transferred her to the York County [Pennsylvania] Prison.

On March 30 Asylum Officer James L. Reaves conducted an Asylum Pre-Screening Interview of Ms. Fiadjoe, after which he found that she had established a significant possibility of a claim for asylum based on her membership in a particular social group (unmarried women over 25 in Ghana). He also found that Ms. Fiadjoe had established a credible fear of persecution or torture.

On the same day the Immigration and Naturalization Service ("INS")[1] charged Ms. Fiadjoe with removeability under §§212(a)(6)(C)(i) and 212 (a)(7)(A)(i)(I) of the INA, 8 U.S.C. §§1182(a)(6)(C)(i), (a)(7)(A)(i)(I) (2003) and issued a notice to appear. At a June 1, 2000 hearing before an IJ Ms. Fiadjoe conceded that she was removable under §212(a)(7)(A)(i)(I) of the INA for being an intending immigrant not in possession of a valid visa or other entry document.

Ms. Fiadjoe filed applications for asylum, withholding of removal, and protection under the Convention Against Torture, Article 3 of the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, Annex 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("CAT"). The IJ, Donald Vincent Ferlise, held an evidentiary hearing on April

---

[1] The enforcement functions of the INS have since been transferred to the Department of Homeland Security, pursuant to §441 of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

30, 2002, after which he denied Ms. Fiadjoe's application for relief and ordered her removed to Ghana.

Ms. Fiadjoe filed a timely appeal with the BIA. On June 6, 2003 the BIA dismissed the appeal. Ms. Fiadjoe filed a timely petition for review of the BIA's decision in this court and subsequently filed a motion with the BIA seeking reconsideration of the BIA's June 6 order. On February 18, 2004 the BIA denied the motion to reconsider. Ms. Fiadjoe filed a petition for review of the BIA's February 18 decision. That petition has been consolidated with the first petition.

## II. **Petitioner's Evidence**

Ms. Fiadjoe's claims for relief stem from her assertion that from age seven until she fled from Ghana, with an eleven year interval from 1978 until 1989, her father held her as a slave, subject to physical beatings and frequent rape, pursuant to the tenets of the Trokosi religion, of which her father was a priest.

The nature and existence of the Trokosi practices are described in a number of documents that are in the record. The United States Department of State Country Report on Human Rights Practices in Ghana released in February 2001 (the "State Department Report" or the "Report") is one example. In a summary statement the Report states, "Violence against women is a serious problem. Traditional practices, including a localized form of ritual servitude (Trokosi) practiced in some rural areas, still result in considerable abuse and discrimination against women and children." The Report further noted that "[v]iolence against women, including rape and domestic violence, remains a significant problem. A 1998 study revealed that particularly in low-income, high-density sections of greater Accra, at least 54 percent of women have been assaulted in recent years," and that "[w]omen, especially in rural areas, remain subject to burdensome labor conditions and traditional male

5

dominance."

The State Department Report described in some detail Trokosi practices:

> Although the Constitution prohibits slavery, it exists on a limited scale. Trokosi, a traditional practice found among the Ewe ethnic group and in part of the Volta Region, is an especially severe human rights abuse and an extremely serious violation of children's and women's rights. It is a system in which a young girl, sometimes under the age of 10, is made a slave to a fetish shrine for offenses allegedly committed by a member of the girl's family. In rare instances, boys are offered. The belief is that, if someone in that family has committed a crime, such as stealing, members of the family may begin to die in large numbers unless a young girl is given to the local fetish shrine to atone for the offense. The girl becomes the property of the fetish priest, must work on the priest's farm, and perform other labors for him. Because they are the sexual property of the priests, most Trokosi slaves have children by the priests. Although the girls' families must provide for their needs such as food, most are unable to do so. There are at least 2,200 girls and women bound to various shrines in the Trokosi system, a figure that does not include the slaves' children. Even when freed by her fetish priest from the more onerous aspects of her bondage, whether voluntarily or as a result of intervention by activists, a Trokosi women generally has few marketable skills and little hope of marriage and typically remains bound to the shrine for life by psychological and social pressure arising from a traditional belief that

6

misfortune may befall a Trokosi woman's family or village if she abandons her obligations to the shrine. When a fetish slave dies, her family is expected to replace her with another young girl, thus perpetuating the bondage to the fetish shrine from generation to generation.

In 1998 Ghana's Parliament passed legislation that, among other provisions designed to protect women, banned the practice of "customary servitude" (known as Trokosi). After passage of this legislation, the Report states, "[t]he CHRAJ and International Needs have had some success in approaching village authorities and fetish priests at over 316 of the major and minor shrines, winning the release of 2,800 Trokosi slaves to date and retraining them for new professions." However, as of the time of the report (2000), "[t]here are at least 2,200 girls and women bound to various shrines in the Trokosi system, a figure that does not include the slaves' children."

Despite the 1998 legislation, as of the year 2000, "[t]he Government has not prosecuted any practitioners of Trokosi, and in August 1999, a presidential aide criticized anti-Trokosi activists for being insensitive to indigenous cultural and 'religious' practices." The Statement Department Report recites at great length the terrible abuses committed by Ghana's police, noting that "[i]n recent years, the police service in particular has come under severe criticism following incidents of police brutality, corruption, and negligence." With respect to the police and their reaction to violence against women, the Report recites "[v]iolence against women, including rape and domestic violence, remains a significant problem . . . a total of 95 percent of the victims of domestic violence are women, according to data gathered by the FIDA. These abuses generally go unreported and seldom come before the courts. The police tend not to intervene in domestic disputes."

It is against this well-documented background that Ms. Fiadjoe's account of her own experiences unfolds. These events are described in her affidavit in support of her asylum application (Form I-589) and in her April 30, 2002 hearing testimony. They are described in the report of the psychologist who treated her for the trauma these events caused.

Ms. Fiadjoe was born a member of the Ewe tribe on March 17, 1971 in Accra, Ghana. When she was a young child her parents separated. She was too young at that time to remember her parents living together. Her mother remarried and remained in Accra. Her father, a farmer, also remarried and lived in a village called Veku outside of Anloga, a remote area of rural Ghana. Ms. Fiadjoe was sent to live with her father.

The father was a Trokosi priest, maintaining a shrine in his home where he and other members of the Trokosi cult conducted Trokosi rituals. In 1978 when Ms. Fiadjoe was seven years of age, her father, pursuant to Trokosi practices, sought to make her his slave, working for him and the shrine and submitting to him sexually. During an approximately three months period the father sexually abused Ms. Fiadjoe as part of the Trokosi tenets. Fortunately for Ms. Fiadjoe, her father's sister, Aunt Dela, objected to this abuse and took Ms. Fiadjoe to live with her family in Accra. There Ms. Fiadjoe no longer saw her father and was able to attend school and live the life of an independent young woman. She was a Christian, of the Baptist persuasion.

Sadly, in 1989 Aunt Dela was killed in an automobile accident. Her husband remarried and directed Ms. Fiadjoe to leave his house. She had nowhere else to go except to return to her father in Veku. There she once again became her father's slave subject to beatings and rape. Approximately a year after her return she described to her grandmother the torments to which she was being subjected. The grandmother reported the beatings to the police but did not mention the

rapes because of the disgrace that such a revelation would bring upon the family.  The police refused to intervene on the ground that only a domestic dispute was involved.

Ms. Fiadjoe attempted to escape from these conditions. She went to work selling fish in order to accumulate some money.  When she had saved enough she moved out of her father's house and rented a room of her own.  However, after returning to her room one evening her landlord returned her rent and told her she could not stay.  He had been threatened by her father.  Ms. Fiadjoe sought to escape through marriage and dated two men of her village, first Titi and then Agol, each of whom wanted to marry her.  Her father would not allow a marriage and scared off each of these men.

In 1996 Ms. Fiadjoe met a Muslim man, Ahmed Kublano who lived with his parents in Anloga.  His brother Rasheed lived nearby.  Ms. Fiadjoe and Ahmed fell in love and wanted to marry.  In order to persuade the father to consent Ahmed brought him gifts, but he could not bring his family because they were Muslims and opposed the marriage. Ms. Fiadjoe had informed Ahmed about the beatings but had not told him that her father periodically raped her.  Ahmed persuaded her to leave her home and go with him to stay with his cousin in Nigeria.

The two fled to Nigeria and stayed with the cousin. They stayed there a week, but the cousin started to approach Ms. Fiadjoe sexually and they had to leave. Having no money it was necessary that they return to Ghana.  Ms. Fiadjoe had no place to go other than her father's house.  As she explained at her asylum hearing, she had to go back "because we [she and Ahmed] are not married and in Ghana before you can be free from your father, your father have to accept your marriage."

The father resumed beating Ms. Fiadjoe and poured boiling water over her because she had disobeyed him.  The sexual abuse continued.  She and Ahmed continued to see each other and still wanted to marry.  It was a star-crossed

9

relationship.  As Ms. Fiadjoe stated in her affidavit: "My father hated Ahmed because he did not want me to be with anyone but him, and because Ahmed was a Muslim.  My father was opposed to the marriage and he said that I can't marry Ahmed because I am a Christian.  Ahmed's family did not approve of me and did not want us to marry because I am a Christian."

Ms. Fiadjoe became pregnant by Ahmed and hoped that this would persuade her father to agree to her marriage.  When she told her father of her pregnancy he beat her until she miscarried.  Ahmed continued to visit Ms. Fiadjoe.  He did so on March 5, 2000, waiting in her bedroom before they went out together.  Ms. Fiadjoe testified that at that point "I went to the shower to take a bath and then, when I came back, when I was coming out, I saw my father coming out of my room, but I knew Ahmed was in the room, so when I went there Ahmed was lying in blood . . . I hold [his] hand and he didn't talk to me, he was just lying in the blood and he didn't do anything, so to me I was thinking he's dead."

Ms. Fiadjoe started shouting and her father told her that if she didn't shut up he would kill her.  She took the money she had saved and left the house.  She proceeded to Ahmed's brother, Rasheed, to tell him what had happened.  She then went to the roadside and took a car to Accra.  There she went to her mother's house and told her what had happened.  The mother did not want Ms. Fiadjoe to stay with her because she knew the father was dangerous.  Ms. Fiadjoe then sought refuge with her Aunt Dela's husband, who did not even want her to sit down, or enter the house because he was afraid of the father.

Next Ms. Fiadjoe went to a person she had known for many years named Alfred who, for fear that the father would suspect that Ms. Fiadjoe was with him, took her to his girlfriend's house.  As Ms. Fiadjoe testified: "When he took me to his girlfriend's house, he told me you can't stay here with this problem, you can't stay here, so, he took me to town,

10

took passport size picture and then he gave me some clothes, I stayed there for about five days, I stayed with them for about five days, he gave me passport to just leave . . . The passport he gave to me, I'm going to Canada, if I go to Canada, I will meet somebody at the airport, they will be holding my name."

Ms. Fiadjoe gave five hundred thousand Ghanian cedis to Alfred and received from him $130 U.S. dollars and the passport which bore her photograph and the name Mercy Appiah-Kubi. Alfred drove her to the airport on March 10, 2000. She flew to JFK Airport in New York City, arriving on March 11. There she was taken into custody by INS officials.

INS officials questioned Ms. Fiadjoe that day and completed a handwritten Record of Sworn Statement in Proceeding under Section 235(b)(1) of the Act. Her answers made very little sense. In response to the question "Why did you leave your home country or country of last residence?", she responded, "I want to look after my mother." In response to the question "Do you have any fear or concern about being returned to your home country or being removed from the United States?" she replied, "Yes. I cannot look after my sisters and brothers." In response to the question "Would you be harmed if you are returned to your home country or country of last residence?", she responded "Yes . . . I can't stand the responsibilities."

After the INS transferred Ms. Fiadjoe to York County Prison, Officer Reaves administered an Asylum Pre-Screening Interview on March 30. Contrary to the facts as she later recounted them, Ms. Fiadjoe informed Officer Reaves that her father's beatings began three years ago, that her father tried to have sex with her but that she never allowed it.

In due course Ms. Fiadjoe was released from detention and took up residence at International Friendship House. She had great difficulty adjusting to her environment and neighborhood. Her then attorney referred her to Kathleen M. Jansen, M.S., C.T.S., a psychologist and adult therapist associated with the Victim Assistance Center of York,

11

Pennsylvania, who first saw Ms. Fiadjoe on May 5, 2000. At the outset Ms. Jansen found that Ms. Fiadjoe was withdrawn and highly anxious, made almost no eye contact, kept her head down, spoke very softly and frequently dissociated[2].

Ms. Jansen's recital of the events of Ms. Fiadjoe's prior life coincided virtually identically with events as later described in Ms. Fiadjoe's asylum affidavit, which she executed on July 5, 2001, and her April 2, 2002 testimony. In three respects Ms. Jansen's report became a basis of the IJ's and the BIA's credibility determinations. First, it is apparent that she had no understanding of the Trokosi sect and its relationship to the torments to which Ms. Fiadjoe was subjected. In this regard Ms. Jansen wrote, "Ms. Fiadjoe describes her father as having a religious 'fetish' which I have come to believe refers to what we would call an addiction." Second, referring to Ahmed, Ms. Jansen wrote, "[h]e was aware of the sexual assaults by her father, but was powerless to stop them." Third, she described the death of Ahmed as if he had been shot, writing: "On the night before she left her father's home for the last time, she reports being in the 'shower room' when she heard noises. When she emerged, she found her boyfriend lying <u>shot</u> on the floor. He was still alive when she reached him, and died in her arms." (emphasis added).

Ms. Jansen described Ms. Fiadjoe's emotional status:

> Work with Ms. Fiadjoe has been complicated by the long history of multiple traumas and the underlying fear of being returned home. As

---

[2] In psychology "dissociation" is "a defense mechanism in which a group of mental processes are segregated from the rest of a person's mental activity in order to avoid emotional distress, as in the dissociative disorder (q.v.), or in which an idea or object is segregated from its emotional significance, in the first sense it is roughly equivalent to splitting, in the second, to isolation." Borland's Medical Dictionary, 27th Edition (1988).

with many incest survivors, she has learned to endure trauma by dissociating, emotionally removing herself from her surroundings until the pain has subsided.

…

Each time I met with Ms. Fiadjoe, I see dramatic improvements.  She has established eating and sleeping habits that are within normal limits.  Her communication abilities have improved, although she continues to occasionally dissociate when discussing emotionally painful events.  She is able to maintain reasonable eye contact and has a significantly greater range of affect.  She is able to discuss many more difficult subjects without dissociating or breaking down.  She remains extremely fearful of her father finding out where she is and of being sent back to Ghana and forced to return to his home.

Ms. Jansen's report thus described Ms. Fiadjoe's somewhat fragile emotional state as she proceeded towards her asylum hearing continuing "to occasionally dissociate when discussing emotionally painful events."

### III.  **April 30, 2002 Hearing and Initial Oral Decision**

Ms. Fiadjoe's asylum hearing on April 30, 2002 posed a challenge to her ability to discuss the difficult subjects of

13

rape and incest without dissociating or breaking down.  Her

attorney, Mr. Piver, commenced by questioning her about her

early years, her religion, Trokosi practices and the start of her

father's sexual abuse when she was seven.

While Ms. Fiadjoe testified about the initial sexual

abuse at age seven, the cessation of the abuse while she was

in Accra with her Aunt Dela and its resumption eleven years

later, the IJ, Donald V. Ferlise, appeared unable to

comprehend this sequence of events and the following

interchange between him and the witness took place:

> Q:     Well, how long, how long did this go on,
>         that you were being raped and beaten?

JUDGE TO MR. PYVER (sic)

> Q:     What?
>
> A:     We're getting to that?
>
> Q:     Well, I'm getting to it now.

JUDGE TO MS. FIADJOE

> Q:     How did this go on?
>
> A:     It, when I left to Accra it stopped, but

14

when I came back to my father again then, at the age of 18 it continued from there.

Q:   All right, (indiscernible) at age seven, did your father beat or rape you at age seven?

A:   Yes.

Q:   For how long of period of time did that go on?

A:   For, til I was seven, I know my father was raping me.

Q:   Ma'am, you're not making any - -

A:   - - For it went - -

Q:   - - Ma'am, you, you can cry, that's fine, but your not making any sense, and the tears do not do away with the fact that your not making any sense to me.  Now, rather than crying, just answer the question.  You said, your father raped you at age seven and he would beat you, correct?

A:   Yes, but I didn't tell anybody.

Q:   I don't care if you did or not.  At age seven, how long did this go on that he was raping you and beating you?

15

A:    In fact, he was doing that to me when I cried to my auntie, I want to - -

Q:    - - Ma'am, I don't like it when someone beats around the bush, okay, when they don't answer me.  Another thing I don't like is when somebody makes sounds as if their crying and their eyes stay dry, all right.  It's a form of histrionics, stage (indiscernible), I don't like that.  I want straight answers and I want straight answers right now.  You said, your father beat you and raped you at age seven, how long did that go on while you were age seven?

A:    In fact, it went until age seven and I left.

Although it had been established that Ms. Fiadjoe had been born in 1971, that her father's sexual molestation began when she was seven in 1978, that she left for Aunt Dela's home that year and returned to her father eleven years later when Aunt Dela died, the IJ hounded Ms. Fiadjoe because after the IJ's previous brow beating she could not testify as to the year when she returned to her father.  This exchange ensued:

MR. PYVER (sic) TO MS FIADJOE

Q:    Okay, did you, when you went back to live with your father, had you, did, strike that - -, when you went back to live with your father, how was your treatment at that time?

A.    He tried to beat me and rape me again.

Q:    Okay, how long did that start after you

16

returned to his home?

A:      After a year.

Q:      After a year.

JUDGE TO MS. FIADJOE

Q:      All right, when did you return to your
        father, what year?

A:      (No audible response).

Q:      Madam, please answer my question?

A:      I don't remember the year, but I knew I
        was 18 years, I don't remember the year.

Q:      You don't know what year it occurred
        in?

MR. PYVER (sic) TO MS. FIADJOE

Q:      No, how, what year were you in - -

A:      - - Wait a minute, please

JUDGE TO MS. FIADJOE

Q:      Do you know what year it, it occurred in?

A:      (Indiscernible).

Q:      You know the question, please don't do
        this, don't beat around the bush, it's
        aggravating, you know the question,
        what year did you return to your father?

17

A:     (No audible response).

JUDGE FOR THE RECORD

All right, I find the respondent is non responsive to the question.

The IJ challenged Ms. Fiadjoe's testimony that her father maintained a room in his house which contained idols:

JUDGE TO MS. FIADJOE

Q:     Did you ever go into the room?

A:     No.

Q:     How do you know what was inside the room if you were never in there?

A:     Because I go there once a month.

Q:     Well, how do you know - -

A:     - - To perform, in there performing, I see them performing rituals.

Q:     Were you in the room or not?

A:     No.

Q:     Well then how did you know what was in the room if you were never in there?

A:     There's (indiscernible), I don't know, I

18

know there is idols.

Q:     How do you know that if you never went in?

A:     Because they have some of them outside, outside, they have some of them outside.

Q:     How can you tell me what's in the room if you were never there, explain that to me?

A:     I'm not allowed there because, I'm not part of them and I see some of the idols inside and outside the room, so that it is why I'm saying their idols. And they (indiscernible) in there particular days and they (indiscernible), they go there to perform rituals.

Q:     So, it's because there's idols outside the room, you think there's idols inside the room, although you've never seen them?

A:     Yes, because they prepare food and a lot of them outside, they take into the room.

The IJ pursued with extreme insensitivity a subject that must have been particularly painful to Ms. Fiadjoe - the murder of Ahmed:

JUDGE TO MS. FIADJOE:

Q:     You told me, that you never told Ahmed,

19

that your father had sexually assaulted you, but apparently, you told Ms. Jansen, that you told Ahmed about the sexual assaults, why is that?

A:      In fact, I told, Ms. Jansen, that I let Ahmed know that abuse, but I didn't clarify it today.

Q:      Well, she's stating here, that Ahmed was aware of the sexual assaults by your father, that's pretty clear to me.

A:      But, I did not tell her about the assault, the beatings and all, I didn't clarify it to, Ms. Jansen.

Q:      Well, is she, she a fortune teller, she can read your mind without you telling her, it's clear here, she says that Ahmed was aware of the sexual assaults by your father, so, you must have told her. That's not what you told me today though, why is that, why is there a difference between what, Ms. Jansen, writes in her letter and what you've told me?

A:      Because, Ms. Jansen, is the one who let me know it's okay to tell, but I did not explain that, I did not tell this part and this part, I just say, abuse and say (indiscernible), I did explain, clarify that to her, but she let me know that it's okay to tell somebody so that you can, I can feel okay, I can be healed (indiscernible).

Q:      Yes, but your double talking me, it says

20

that, just answer my question, the letter from Ms. Jansen says, that Ahmed knew about the sexual assaults by your father, you told me that Ahmed did not know, so tell me why Ms. Jansen's telling me one thing, and why you're telling me something else?

A: (No audible response).

Q: I'm waiting for your answer.

A: Please, I don't know, I don't have answer for that.

The concluding portions of the hearing further demonstrated the IJ's continuing hostility towards the obviously distraught Ms. Fiadjoe and his abusive treatment of her throughout the hearing. He had succeeded in returning her to the condition which Ms. Jansen had enabled her to overcome after repeated therapy sessions, breaking down and dissociating. As reflected in the transcript:

JUDGE FOR THE RECORD
All right, let me go off the record and we'l (sic) decision.
(OFF THE RECORD)
(ON THE RECORD)
JUDGE RENDERS ORAL DECISION
JUDGE TO MS. FIADJOE

Q: Ms. Fiadjoe, you've heard my decision, you've heard what I've just said?

A: (No audible response).

Q: Oh, you were sleeping there, you fell asleep didn't you?

21

A:     (No audible response).

Q:     You fell asleep during my decision?

A:     No, I'm feeling headache.

Q:     Did you hear what I said or were you asleep?

A:     I wasn't asleep.

Q:     Did you hear what I said?

A:     I thought that you (indiscernible), so I didn't.

Q:     Okay, all right, well, what I said was, that first of all, I don't believe your testimony, I think that you were making up your testimony as you were going along.  Your testimony is contradicted by, much of it is contradicted by your own witness, Ms. Jansen, her, her the letter that she wrote, your testimony generally doesn't make any sense.  I further found, and I denied it, basically because of that, I further found that if I had found that you were credible, that you were telling me the truth, I do not find that - -

(OFF THE RECORD)
(ON THE RECORD)

JUDGE TO MS. FIADJOE

Q:     I don't find that you have been persecuted and on one of the five statutory grounds.  I don't find, first of all, there are relatively few women involved in this movement, all right, sexual slaves.  They number by 2,200, now you described it as, as a sexual

22

slave, I read from the State Department it seems there's, there's some sexual slavery involved with it, but it has a lot to do with idiolatry and voodoo and fears and just a lot of nonsense. I don't find that a group of 2,200 plus or minus women would be particular social group, it's small group and it's only in a certain section of, of Ghana, around the (indiscernible) region. Even if I found that it was a particular social group, the government is not persecuting anyone, all right, and the government is not allowing this to continue, they passed a law in 1998 and they had, there trying to abolish Trokosi and apparently according to the State Department, they think that it will be abolished in the, in the near future. So, even if it were a particular social group, that's these women, a small group of women, I don't find that they've been persecuted pursuant to definition of persecution. And for that reason, I've denied your application, do you understand, now?

A:     Yes.

Q:     Okay, the answer is yes.

## IV. The Sanitized Oral Decision

On the hearing date the IJ also delivered a sanitized

version of his original crude (and cruel) Oral Decision. It will

23

be referred to as the "IJ Decision".

Having found that Ms. Fiadjoe was "inadmissible for presenting a bogus passport to the Immigration authorities" and also under Section 212(a)(6)(C)(i) (fraud on an immigration official), the IJ set forth general legal principles applicable to applications for asylum and for restriction on removal.

Turning to the circumstances about which Ms. Fiadjoe testified, the IJ rejected the evidence that Trokosi was a form of religion, finding that "it does not appear to the Court that this is a religion, it is rather a cult."

The bulk of the opinion was devoted to the reasons why the IJ found Ms. Fiadjoe totally incredible. As he stated in his original oral decision "I don't believe your testimony. I think that you were making up your testimony as you went along." The first reason for this finding was Ms. Fiadjoe's inability to specify the year in which she returned to her father after spending eleven years with Aunt Dela. The IJ wrote:

24

The respondent was asked when she returned to her father and she was unable to tell the Court when it occurred. If indeed this had transpired in the respondent's life and if indeed she was living safely with her aunt for 11 years, it is abundantly clear to the court that the respondent would be able to tell me when she returned home to that situation that she feared so much.

The second reason that the IJ gave for rejecting Ms. Fiadjoe's testimony was the inconsistency he perceived between her testimony that she had never been in the room in which her father and other participants performed rituals and her testimony that there were idols in that room:

The respondent's father told her that he wanted her to be a Trokosi slave, she stated that the father had a room inside his house in which she was not permitted to enter, in which there were idols. The Court asked the respondent if she had never entered that room, how she knew there was idols inside; and her answer was that she presumed they were idols inside the room that she had never entered since they were idols outside the room. This line of thought on the respondent's part is not particularly persuasive.

The IJ found reason to doubt Ms. Fiadjoe's testimony in the fact that she returned to her father's house after returning with Ahmed from Nigeria:

Ahmed and the respondent in April of 1997, traveled to Nigeria by bus to live with Ahmed's cousin. The cousin of Ahmed apparently made sexual advances to the respondent, so that after three weeks, she and Ahmed returned to Ghana

25

and the respondent returned to her father's home. The respondent was asked why, if she had been beaten and raped at her father's home, did she return there. She states that she returned there since she did not want her father to be angered by the fact that she was with Ahmed. This absolutely is totally implausible and totally nonsensical to the Court, insofar as the respondent was returning to a situation where she knew she was going to be raped and beaten. And I don't believe that she would have any fear that her father would be angered and if she did have a fear, that fear would be a lesser fear than the rape and the beatings that she knew awaited her. As it turned out, when the respondent did return, her father not only beat her but poured hot water on her as a form of punishment.

The IJ relied upon perceived inconsistencies between Ms. Fiadjoe's testimony and her statements to Ms. Jansen as reflected in Ms. Jansen's report. He found that Ms. Jansen's report cast doubt upon Ms. Fiadjoe's testimony that her abusive father was part of the Trokosi sect or that she was a Trokosi slave:

> The respondent submitted to the Court a letter/report from Social Worker Kathleen Jansen, which is found at Exhibit 6, tab 2. A careful examination of Ms. Jansen's letter reflects nothing to the effect that the respondent's father was a member of the Trokosi cult, nor that the respondent herself was a Trokosi slave. The respondent was not able to explain why what she told the Court, was not told to the social worker.

26

The IJ found that Ms. Fiadjoe's testimony that she only told her grandmother about her father's sexual abuse is contradicted by Ms. Jansen's report which recites that Ms. Fiadjoe also told her mother about the sexual abuse. The IJ found contradiction of Ms. Fiadjoe's testimony that she never told Ahmed about the sexual nature of her father's abuse in the statement in Ms. Jansen's letter that Ahmed "was aware of the sexual assaults by her father, but was powerless to stop them." Further, the IJ notes an inconsistency between Ms. Fiadjoe's statement that she does not know how her father killed Ahmed and the statement in Ms. Jansen's report that "[w]hen she emerged [from the shower], she found her boyfriend lying shot on the floor."

The IJ also based his credibility evaluation on statements that Ms. Fiadjoe made to immigration officials when she was initially processed after her detention. At the airport she did not disclose her reason for fleeing Ghana and "told the Immigration Officer a rather benign reason for coming here, the fact that she was not able to financially provide for her siblings." The IJ referred to the asylum pre-screening interview document:

> That document reflects on page 4, that the respondent told the Immigration Officer that her father started beating her three years ago. That is three years ago prior to March 30th of 2000, consequently that would be March of 1997; however, the respondent told the Court that she was 7 years of age when the beatings began. Thus, again we have a diametric difference between what the respondent told this Court and what the respondent told the Immigration Officer during the asylum pre-screening interview.

> Even more interesting is the fact that, again according to this interview, the respondent told

27

the Immigration Officer that her father never had sex with her. This totally undermines the entire case in chief, since her entire case in chief is based on her father using her as a sex slave. Whenever the Court sees such a diametric difference between the testimony that the respondent has given to the Court and the testimony that the respondent has given another member of the Immigration Service, the credibility of the respondent and the case in chief gravely suffer.

The IJ emphasized that "[t]he credibility of the respondent is of extreme importance in assessing the respondent's claim . . .. The Court concludes that the respondent is making up her testimony as she is going along, she's making up these scenarios and she is fabricating her testimony to the Court. . . . the Court again states for the record that this was a frivolous application and that the respondent intentionally lied to this Court."

The IJ provided alternative grounds for denying Ms. Fiadjoe's applications for relief. He quoted the State Department Report describing the Trokosi cult, including the practice of its priests of maintaining sex slaves at Trokosi shrines. The IJ then held:

The Court finds that being a Trokosi slave or a member of the cult, is being a member of a relatively small group. According to the State Department, it numbers approximately 2,200 people in a small area, in the southeast portion of Ghana. The Court will not find that a Trokosi slave constitutes a particular social group, insofar as it is rather a minuscule part of the general population of Ghana.

Had he found Trokosi slaves to be a particular social

28

group, the IJ held that he "would not find that the respondent is being persecuted as being a member of that social group and does not qualify for asylum, insofar as I find that this practice is being stamped out by the government, according to the State Department reports; and that it can be eradicated by the government within a short period of time, with the passage of a law which occurred in 1998."

A rather confusing observation followed in support of the IJ's finding that Ms. Fiadjoe had not established a well-founded fear of persecution. The IJ appeared to believe that Ms. Fiadjoe was alleging that she was being persecuted because she was a member of the Trokosi sect, when in fact she was asserting that with the acquiescence of governmental officials, the Trokosi sect was persecuting her, forcing her into practices totally contrary to her Christian faith. The IJ observed:

> The government does not condone this slavery. It is perpetuated by a rather small number of people following an ideology, some type of voodoo religion or voodoo following, and the Court does not find that it constitutes a persecution of this group of women, even if these women should be classified as a particular social group. The Court considers the Trokosi as an isolated aberration of the small segment of the society in Ghana, but I do not find that it is a ground for asylum. I do not find that members of that group are being persecuted for one of the five statutory grounds for a grant of such relief.

> Consequently, for all of these reasons, the Court finds that the respondent has not established well-founded fear of persecution as defined, if she were returned to Ghana. Accordingly her application for asylum will be denied.

29

Based on the foregoing, the IJ determined i) it was unnecessary to consider whether Ms. Fiadjoe merited relief as a matter of discretion; ii) because Ms. Fiadjoe failed to establish eligibility for asylum, she failed to meet the higher standard of proof necessary for restriction on removal to Ghana; and iii) Ms. Fiadjoe does not qualify for relief under the CAT because she did not establish that she is more likely than not to be tortured if she returns to Ghana.

The IJ entered orders denying Ms. Fiadjoe's request for asylum, for restriction on removal to Ghana and for withholding removal under the CAT. He ordered that she be removed from the United States to Ghana.

## V. **Proceeding before the BIA**

On appeal from the IJ's decision the BIA relied heavily upon the IJ's credibility determination: "In denying the respondent's applications for relief, the Immigration Judge found that the respondent was not credible (IJ at 11-12). We agree." The BIA advanced two grounds for its credibility determination - i) perceived inconsistences in her testimony at the hearing before the IJ and ii) inconsistencies in her statement at her Asylum Pre-Screening Interview.

With respect to Ms. Fiadjoe's testimony, the BIA noted that Ms. Fiadjoe made conflicting claims as to the age when her Trokosi ritual sexual abuse by her father began, referring to the following inconsistencies or supposed inconsistencies: i) in her asylum application and during her testimony Ms. Fiadjoe claimed that her father began to abuse her sexually and attempted to rape her when she was seven years old; ii) in further testimony she asserted that her father had in fact raped her when she was seven; iii) in her statement given at her Asylum Pre-Screening Interview she stated that the abuse began approximately three years prior to her March 2000 interviews and claimed that she did not allow her father to have sex with her, in contrast to later claims of on-going rape.

30

The BIA concluded that "[b]ecause we have found that the respondent's testimony cannot be accepted as credible, it follows that the respondent has failed to satisfy her burden of proof and persuasion."

Further, the BIA held that Ms. Fiadjoe's claims must be denied for failure to establish that the government of Ghana was either unwilling or unable to control her father's ritual abuse. In support of this conclusion the BIA noted i) Ms. Fiadjoe did not seek help of the Ghanian authorities; ii) the grandmother when reporting the father's abuse to the police did not mention the sexual aspect of the abuse; iii) the government outlawed Trokosi practices and ritual bondage in 1998 and a non-governmental organization had success in liberating, counseling, and rehabilitating past victims of such bondage.

The BIA found that Ms. Fiadjoe implicitly admitted that she could escape her father's abuse by moving to an urban area, citing as support; i) Ms. Fiadjoe's escape when she fled to Nigeria; ii) her move into an apartment; and iii) her unconvincing testimony about being impelled to return to the father's home after the abortive flight to Nigeria. The BIA concluded "the respondent's failure to pursue internal relocation would likely be a negative discretionary factor even if we had found that she had suffered past persecution on account of a protected ground."

Because the BIA had found that Ms. Fiadjoe had not testified credibly and that she had failed to demonstrate that the government of Ghana would be unwilling or unable to protect her, it did not reach the issue of whether bondage as a Trokosi slave would meet the definition of persecution on account of membership in a particular social group or the issue whether Ms. Fiadjoe, even if credible, had established that she was, in fact, a Trokosi slave.

Finding that Ms. Fiadjoe had failed to establish the lower burden of proof required for asylum, the BIA held that she had failed to meet the higher standard for withholding of

31

removal and that she had failed to establish that it was more likely than not that she would be tortured upon her return to Ghana, thus requiring that her request for relief under the CAT be denied.

With one member, Juan P. Osuna, dissenting, the BIA dismissed the appeal on June 6, 2003. Ms. Fiadjoe filed in this court a timely petition for review of the BIA's decision. Ms. Fiadjoe also moved for reconsideration of the BIA's decision. One of the grounds for the motion to reconsider was the failure of the BIA to consider certain evidence which was not before the IJ but which Ms. Fiadjoe submitted in support of her appeal. In particular she submitted an October 31, 2002 letter of Ms. Jansen which explained why certain of the statements made in her earlier letter on which the IJ relied to find that Ms. Fiadjoe lacked credibility constituted Ms. Jansen's mistakes or misunderstanding. Ms. Jansen's October 31, 2002 letter also spelled out in considerable detail the nature and consequence of the stress from which Ms. Fiadjoe suffered from her father's abuse and the effect this stress had with respect to Ms. Fiadjoe's responses to questions concerning sexual abuse matters. The following are a few of Ms. Jansen's observations concerning Ms. Fiadjoe's emotional state:

> It is my professional opinion that Posttraumatic Stress Disorder, Ms. Fiadjoe's own mannerisms, and the Immigration Judge's lack of awareness of Ghanian culture contributed to Ms. Fiadjoe's responses to questioning by opposing counsel and, in particular, to the Judge. It is extraordinarily difficult for sexual abuse victims to discuss specifics of their abuse experiences. Given the extreme shame that surrounds these issues in general they are difficult for both men and women to discuss. With the addition of the cultural factors surrounding Ms. Fiadjoe's experiences in particular, it should be of no

32

surprise at all that she would be reluctant to discuss these issues with anyone, most specifically with a male or in the presence of several males. It is very typical of victims of sexual abuse to not be able to accurately recall dates, ages, number of abuse occurrences and time lines in general. In addition, I believe cultural factors played a role. In many cultures the specifics of dates, time, and ages are not valued as significantly as they are in western, industrialized cultures. The combination of cultural factors and traumatic stress reactions would be expected to impede one's memory of dates, times and ages.

...

I believe I also communicated in my initial letter that because of her history of severe abuse, under situations of duress she tends to dissociate. This means that if she feels threatened or endangered - physically or emotionally - she will withdraw from the situation, become confused, frightened, hesitant, and may appear to have a blank look on her face. This is a natural consequence of the Posttraumatic Stress Disorder from which she suffers.

...

The Immigration Judge believed that Ms. Fiadjoe was fabricating her account of rape by her father because he found inconsistencies. These inconsistencies are not evidence of

33

dishonesty in Ms. Fiadjoe's case - they are evidence of severe Posttraumatic Stress Disorder. It is also noteworthy that at the time of this hearing, Ms. Fiadjoe was approximately seven months postpartum and, by history, suffered a significant bout of Postpartum Depression for approximately nine months after the birth of her daughter. This condition would, as well, affect both her memory and her communication style. Similarly it does not at all surprise me that upon initial questioning by INS agents Ms. Fiadjoe would reference her father attempting sexual abuse but deny that he had had intercourse with her. Fear and shame would more than explain that circumstance. Please note that she did disclose the sexual assaults to her grandmother who immediately told her it was shameful for her to discuss those matters. Although the grandmother was willing to report the physical abuse to the police, she refused to report or permit Ms. Fiadjoe to report the sexual violence. I can vehemently affirm that once a sense of safety and a tentative working relationship was established with Ms. Fiadjoe she consistently and clearly disclosed multiple incidents of violent rape by her father during our counseling sessions. It is also important to note that Ms. Fiadjoe's recounting of her experiences in her father's custody never wavered during our work together. As an expert in assessing traumatic stress, and an experienced provider of services to victims of sexual violence I never saw any indication that Ms. Fiadjoe was less than truthful with me or that she was fabricating any of her experiences.

34

In addition to describing Ms. Fiadjoe's emotional state, Ms. Jansen took responsibility for creating what appeared to be inconsistencies between statements contained in her original letter, which was in evidence before the IJ, and Ms. Fiadjoe's testimony. Ms. Jansen explained her failure to use the term Trokosi in her report, limiting her description of the father's behavior as being a "fetish":

> One of the shortcomings of my work with Ms. Fiadjoe falls to my lack of understanding at that time about the Trokosi religion and the definition of a fetish priest. She spoke often of her father's fetish practices and interpreting her words and their meaning was very difficult. She did state on many occasions that her father would be intoxicated just prior to him raping her, and based on my own cultural background I connected the term "fetish" to her father's abuse of alcohol. I did not at that time investigate the religious practices of fetish priests and was unaware of the specifics of the Trokosi religion. Since that time, I have learned more about that religion and its practices and it fits precisely with the experiences she was relating to me. Again, my focus was on her immediate physical and psychological well being and I failed to investigate the cultural implications fully.

Addressing the statement in her original letter that Ms. Fiadjoe had informed Ahmed of the father's sexual abuse, Ms. Jansen wrote:

> There was some controversy over whether Ms. Fiadjoe discussed these matters with her fiancé, Ahmed. In reviewing my notes, I make reference to the fact that Ahmed was "aware of the abuse by her father". When consulting my notes to prepare the initial letter, I interpreted

35

them to mean both the physical and sexual abuse. I cannot now independently recall whether I specifically referred to the physical and sexual abuse when discussing this matter with Ms. Fiadjoe. It would not at all surprise me that she would have told him about the physical abuse but not the sexual abuse. Indeed, noting the cultural taboos and shame involved, it is very likely that she would not tell Ahmed of the multiple violent rapes she endured at the hands of her father.

Addressing the subject of the manner of Ahmed's death, Ms. Jansen explains that she merely inferred that he had been shot and does not recall that Ms. Fiadjoe informed her that he had been shot:

> There appeared to be additional controversy over Ms. Fiadjoe's knowledge of the manner of Ahmed's death. Again, in reviewing my notes, I documented that while in the "shower room" Ms. Fiadjoe heard a "loud noise" and upon entering her bedroom, found Ahmed dying on the floor. I believe that it was my interpretation of events that Ahmed had been shot. I apologize for the confusion that interpretation caused. I have no independent recollection of Ms. Fiadjoe specifically stating the manner of death. Recall, please, that the purpose of my services was not an investigative one. When I began seeing Ms. Fiadjoe she was not able to eat properly, was not sleeping consistently, was experiencing severe flashbacks and distressing nightmares, and was attempting to adjust to an extremely foreign environment. It was my purpose to alleviate the immediate psychological pain and suffering and to assist

36

her in adjusting to her new environment. The exact manner of her fiancé's murder was inconsequential to the critical task at hand.

Apart from the failure of the BIA to consider this additional evidence, Ms. Fiadjoe advanced four other grounds for reconsideration; i) the BIA's reliance upon Ms. Fiadjoe's statements to an INS officer upon arrival as a basis for a negative credibility finding; ii) its finding that Ms. Fiadjoe had failed to carry her burden that the government of Ghana was unable or unwilling to assist her; iii) its finding that Ms. Fiadjoe could have relocated to another part of Ghana; and iv) the BIA's failure to consider Ms. Fiadjoe's persecution on account of her religion as a Christian opposed to Trokosi and her feminist political opinion that women should be educated and not subjugated to men.

The BIA denied the motion for reconsideration stating that Ms. Fiadjoe had not identified any change of law, new legal argument or error in the BIA's previous analysis that would move it to reconsider its decision. It noted that the inconsistent statements to an immigration officer upon which it relied to support its credibility finding were not made at the airport immediately after landing but were made some weeks later during a fair and thoughtful interview, thus rendering Ms. Fiadjoe's reliance upon the cases cited in support of the motion misplaced.

Ms. Fiadjoe filed in this Court a petition for review of the denial of the motion for reconsideration. That petition has been consolidated with the original petition for review.

## VI. **Discussion**

A. Jurisdiction and Standard of Review: We have jurisdiction to review final orders of the BIA under §242(a)(1) of the Immigration and Nationality Act, 8 U.S.C. §1252(a)(1) (1999).

Both the IJ and the BIA made an adverse credibility determination. The final order that we review is the decision

37

of the BIA, and normally we review the decision of the BIA, not the IJ, Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002); Abdulai v. Ashcroft, 239 F. 3d 542 545 (3d Cir. 2001). There are exceptions to this rule. If, for instance, the BIA affirms the IJ's decision for the reasons set forth in that decision, the IJ's opinion effectively becomes the BIA's, and, accordingly, a court must review the IJ's decision. Korytnyuk v. Ashcroft, 396 F.3d 272, 286 (3d Cir. 2005).

In the present case the BIA stated at the outset that it agreed with the IJ's finding that Ms. Fiadjoe was not credible. It then set forth a single paragraph devoted to the credibility issue, listing two of the inconsistencies upon which the IJ had relied. Thus, as in Xie v. Ashcroft, 359 F.3d 239 (3d Cir. 2004), we address the circumstance in which "the BIA both adopted the IJ's adverse credibility determination and discussed some, but not all, of the underlying bases for the IJ's adverse credibility determination." Id., at 242. In the present case, in light of its expression of agreement with the IJ's credibility finding and its own sketchy credibility analysis, the BIA must have relied upon the adverse credibility finding of the IJ. We thus have jurisdiction to review both the BIA's and IJ's opinions. Id., at 242; see also, Miah v. Ashcroft, 346 F.3d 434 (3d Cir. 2003); Senathirajah v. INS, 157 F.3d 210 (3d Cir. 1998). There is an additional reason to review the INS decision and the hearing from which the decision derived. Any adverse credibility determinations based on the testimony must be viewed with great caution in view of the abusive nature of the hearing.

Adverse credibility determinations are reviewed under the substantial evidence standard. Under this standard, the BIA's adverse credibility determination must be upheld on review unless any reasonable adjudicator would be compelled to conclude to the contrary. Minor inconsistencies do not provide an adequate basis for an adverse credibility finding. Xie, 359 F. 3d at 243.

Apart from its adverse credibility determination, the

38

BIA found that Ms. Fiadjoe failed to establish that the government of Ghana was either unable or unwilling to control her father's ritual sexual abuse[3]. We must uphold this factual finding if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). We should find substantial evidence lacking only where the evidence "was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." Id. at 483-84; see also 8 U.S.C. §1252(b)(4)(B); Abdille v. Ashcroft, 242 F. 3d 477, 483-84 (3d Cir. 2001).

B. The IJ Hearing and Credibility Finding[4]: Prior to the commencement of testimony before the IJ on April 30, 2002 the IJ identified the record in his possession. It included Ms. Fiadjoe's July 5, 2001 asylum affidavit (Form I-589) which recited in full detail the circumstances that led to her flight - the commencement of her father's sexual abuse at age seven, the resumption of her life as a Trokosi slave at age eighteen and the continuing beatings and periodic rape committed by her father. It recited her attempts to escape from her father's house, her flight to Nigeria, her return, her father's murder of the man whom she loved and hoped to marry, and her second flight and inability to find someone in Accra who would take her in.

Also in the record which the IJ possessed was Ms.

---

[3] The BIA did not reach the issues of i) whether bondage as a Trokosi slave would meet the definition of persecution on account of membership in a particular social group; ii) whether if Ms. Fiadjoe's testimony were credible she had "established that she was, in fact, a Trokosi slave;" and iii) whether Ms. Fiadjoe could escape persecution by locating elsewhere in Ghana.

[4] Significantly, on this appeal the government made no attempt to defend the credibility determinations of either the IJ or the BIA.

39

Jansen's June 22, 2000 letter describing her therapy sessions with Ms. Fiadjoe and Ms. Fiadjoe's emotional state. Ms. Jansen recounted how Ms. Fiadjoe's emotional condition improved markedly after sessions of counseling and that although "[h]er communication abilities have improved," she nevertheless "continues to occasionally dissociate when discussing emotionally painful events." It was, of course, necessary to testify about emotionally painful events at the April 30, 2002 hearing.

The INS Guidelines entitled "Consideration for Asylum Officers Adjudicating Asylum Claims from Women" describe in general terms the phenomena that Ms. Jansen observed in Ms. Fiadjoe. The Guidelines are as applicable to an IJ credibility determination as they are to an Asylum Officer's credibility determination, e.g.,:

> Women who have been raped or otherwise sexually abused may be seriously stigmatized and ostracized in their societies. They may also be subject to additional violence, abuse or discrimination because they are viewed as having brought shame and dishonor on themselves, their families, and their communities.
>
> …
>
> Women who have been subject to domestic or sexual abuse may be psychologically traumatized. Trauma can be suffered by any applicant, regardless, of gender, and may have a significant impact on the ability to present testimony.
>
> The demeanor of traumatized applicants can vary. They may appear numb or show

emotional passivity when recounting past events of mistreatment. Some applicants may give matter-of-fact recitations of serious instances of mistreatment. Trauma may also cause memory loss or distortion, and may cause other applicants to block certain experiences from their minds in order not to relive their horror by the retelling.

In Anglo-American cultures, people who avert their gaze when answering a question, or seem nervous, are perceived as untruthful. In other cultures, however, body language does not convey the same message. In certain Asian cultures, for example, people will avert their eyes when speaking to an authority figure as a sign of respect. This is a product of culture, not necessarily of credibility.

It bears reiteration that the foregoing considerations of demeanor can be the products of trauma or culture, not credibility. Poor interview techniques/cross-cultural skills may cause faulty negative credibility findings.

From the outset of the April 30, 2002 hearing the IJ took over much of the questioning of Ms. Fiadjoe, both on direct and on cross-examination by the government. His tone was hostile and at times became extraordinarily abusive. If not by design, in effect, he produced the very atmosphere that Ms. Jansen and the INS Guidelines anticipated would cause memory loss, blocking, dissociating and breakdown.

Examining Ms. Fiadjoe concerning the highly sensitive subject of her father's sexual abuse at age seven, the IJ's questioning reduced her to tears (see transcript excerpt at. pp.14-16, <u>supra</u>).

At that point in the proceedings Ms. Fiadjoe began having difficulty responding to the IJ. She had been born in 1971. In response to her attorney's questions she testified that she went to live with her Aunt Dela in Accra when she was seven, i.e., in 1978, thus bringing the sexual abuse to a temporary halt. She further testified that she remained with Aunt Dela eleven years and was 18 years of age when she returned to her father's home upon the death of Aunt Dela. A rather simple calculation would have placed this in the year 1989, but under the IJ's harsh questioning Ms. Fiadjoe was unable to recall the year and was reduced to an inability to respond (see transcript excerpt at pp 16-17, supra).

The bullying nature of the IJ's questioning was further evident in his interrogation of Ms. Fiadjoe about her knowledge that her father kept idols in the room in which he worshiped when she testified that she had never been in the room. Ignoring the obvious point that Ms. Fiadjoe made, that she could see into the room without entering it, the IJ continued to badger her (see transcript excerpt at p. 17-18 supra).

Dealing with a subject that can only have been extremely painful to Ms. Fiadjoe, her father's murder of her fiancé Ahmed, the IJ pursued an apparent inconsistency between Ms. Fiadjoe's testimony and Ms. Jansen's report concerning whether Ms. Fiadjoe had told Ahmed about the sexual aspect of the abuse she had suffered. The IJ reduced Ms. Fiadjoe to an inability to respond to his questions (see transcript excerpt at pp 18-19 supra).

These are examples of the manner in which the IJ treated Ms. Fiadjoe throughout the hearing. An examination of the entire transcript discloses other instances of his extreme insensitivity towards the witness and his failure to take into account the abuses to which she had been subjected in Ghana. The IJ's own concluding questions and remarks demonstrate that he had reduced her to the emotional state against which Ms. Jansen and the INS Guidelines had warned:

42

Q:     Ms. Fiadjoe, you've heard my decision, you've heard what I've just said?

A:     (No audible response).

Q:     Oh, you were sleeping there, you fell asleep didn't you?

A:     (No audible response).

Q:     You fell asleep during my decision?

A:     No, I'm feeling headache.

Q:     Did you hear what I said or were you asleep?

A:     I wasn't asleep.

Q:     Did you hear what I said?

A:     I thought that you (indiscernible), so I didn't.

Q:     Okay, all right, well, what I said was, that first of all, I don't believe your testimony, I think that you were making up your testimony as you were going along. Your testimony is contradicted by, much of it is contradicted by your own witness, Ms. Jansen, her, her, the letter that she wrote, your testimony generally doesn't make sense. I further found, and I denied it, basically because

43

of that, I further found that if I had found that you were credible, that you were telling me the truth, I do not find that - -

(OFF THE RECORD)

As the INS Guidelines stated, "[p]oor interview techniques/cross-cultural skills may cause faulty negative credibility findings". They most certainly did so in this case.

The conduct of the IJ by itself would require a rejection of his credibility finding. Apart from that consideration, the formal reasons he gave for finding "that the respondent is making up her testimony as she is going along, she's making up these scenarios and she is fabricating her testimony to the Court" do not withstand examination.

First, the IJ relied upon Ms. Fiadjoe's inability to state the year when she returned from Aunt Dela to her father's house. It is true that Ms. Fiadjoe, after being subjected to the IJ's brow beating, could not recall the year of her return. However, she testified that she was born in 1971, left for Aunt Dela's home when she was seven (1978) and returned after eleven years when she was eighteen years of age. The inability to recall during the stress of the hearing that the year of return was 1989 does not affect credibility.

The IJ found that Ms. Fiadjoe's testimony that her father kept idols in the shrine room in his home was inconsistent with her testimony that she never entered the room. In spite of the badgering nature of the IJ's questioning, Ms. Fiadjoe fully explained that without entering she could see into the room, that idols were also kept outside the room, and that she observed other Trokosi adherents enter the room to bring food to the idols and later leave. There was no inconsistency in her testimony.

Referring to Ms. Fiadjoe's testimony about her return to her father's home after her and Ahmed's abortive attempt to establish a residence in Nigeria, the IJ attributes to Ms.

44

Fiadjoe the statement that "she returned there since she did not want her father to be angered by the fact that she was with Ahmed." The IJ found that "[t]his absolutely is totally implausible and totally nonsensical to the Court, insofar as the respondent was returning to a situation where she knew she was going to be raped and beaten." The IJ's subsequent observations make no sense: "And I don't believe that she would have any fear that her father would be angered and if she did have a fear, that fear would be a lesser fear than the rape and the beatings that she knew awaited her. As it turned out, when the respondent did return, her father not only beat her but poured hot water on her as a form of punishment." In the first place the IJ does not give an accurate recital of Ms. Fiadjoe's testimony. She did not want her father to attack Ahmed but the reason she gave for returning to her father was that "I don't, my father, I don't have anybody to go to," a fact that, as will be discussed in connection with the BIA's credibility finding, is fully supported by the record.

Next, the IJ found Ms. Fiadjoe lacked credibility because "Ms. Jansen's letter reflects nothing to the effect that respondent's father was a member of the Trokosi cult, nor that the respondent herself was a Trokosi slave. The respondent was not able to explain why what she told the Court, was not told to the social worker." The IJ's premise that Ms. Fiadjoe did not tell Ms. Jansen about the Trokosi sect is totally wrong, even if reference is made only to the letter in evidence before the IJ. Repeatedly throughout the asylum proceedings Ms. Fiadjoe referred to her father's Trokosi practices as his "fetish." In her June 22, 2000 letter Ms. Jansen writes, "Ms. Fiadjoe describes her father as having a religious "fetish." Ms. Jansen at that time did not understand what Ms. Fiadjoe was telling her, a misunderstanding which she later overcame, as explained in her October 31, 2002 letter, which will be discussed further in connection with the BIA's credibility determination. In any event, the IJ was simply in error when he stated that Ms. Jansen's letter reflects nothing to the effect

that Ms. Fiadjoe's father was a member of the Trokosi cult.

The IJ perceived two other inconsistencies between Ms. Fiadjoe's testimony and what appeared in Ms. Jansen's June 22, 2000 letter. He assumed Ms. Fiadjoe told Ms. Jansen what was stated in the letter. First, Ms. Fiadjoe testified that she never told Ahmed about the sexual assaults upon her, whereas the letter states Ahmed "was aware of the sexual assaults by her father, but was powerless to stop them." Second, Ms. Fiadjoe testified that, not having seen her father kill Ahmed, she did not know how he was killed, whereas the letter states "[w]hen she emerged, she found her boyfriend lying shot on the floor." (emphasis added). As disclosed in Ms. Jansen's October 21, 2002 letter (which was not before the IJ), these inconsistencies resulted from Ms. Jansen's erroneous assumptions, not from misstatements of Ms. Fiadjoe. Even if there were such inconsistencies (which there were not), they were minor in nature. In the entire flow of events that afflicted Ms. Fiadjoe from age seven until she fled from Ghana, it was immaterial whether Ahmed knew of the sexual abuse as well as the other forms of abuse perpetrated by the father and whether the father shot or stabbed Ahmed, the only likely other means of killing him.

The IJ relied upon statements that Ms. Fiadjoe made to Immigration officers upon her arrival in the United States and upon the occasion of her Asylum Pre-screening Interview on March 30, 2000, which are inconsistent with her asylum affidavit, the information she provided Ms. Jansen and her testimony. For reasons that will be set forth in the discussion of the BIA's credibility determination, these statements do not constitute substantial evidence that would permit a finding that Ms. Fiadjoe lacked credibility.

As the IJ expressed it, "[t]he credibility of the respondent is of extreme importance in assessing respondent's claim." No adverse credibility assessment derived from a hearing conducted under the circumstances and in the manner that the IJ conducted the April 30, 2002 hearing could survive

46

review.  Further, even if the hearing were conducted in an even-handed, fair manner, the reasons that the IJ gave for his finding of lack of credibility are not supported by substantial evidence.

C.  The BIA's Credibility Finding: Of necessity the BIA had before it the transcript of the IJ hearing and the documentary record.  Ms. Fiadjoe's asylum application, her recital of events during her counseling with Ms. Jansen and her testimony at the hearing were consistent in their detailed description of the extended series of horrifying events that occurred in her life from age seven until her flight from Ghana after the murder of Ahmed.  Despite the IJ's conclusion that "[she was] making up her testimony as [she was] going along," it is highly improbable that anyone could consistently recount these events in detail on each of these three occasions.

The BIA, apart from its general agreement with the IJ's adverse credibility determination, relied upon two grounds for its own adverse credibility determination: i) a purported inconsistency in Ms. Fiadjoe's testimony concerning the nature of the sexual abuse that her father perpetrated upon her at age seven, and ii) the inconsistencies in her sworn statement before an Asylum Officer given approximately nineteen days after she was taken into custody at the airport.  Despite the critical nature of the issue and the extensiveness of the record, the BIA devoted a mere twelve lines of its opinion to set forth the reasons for its credibility finding.

As to the sexual abuse at age 7, the BIA decision stated:

> She claimed in her written asylum application and during her testimony in immigration court that her father began to abuse her sexually and attempted to rape her when she was 7 years old (Exh. 6-2 at 2; Tr. at 25).  Shortly thereafter, she modified her testimony somewhat and claimed that her father had in fact raped her when she

47

was 7 (Tr. at 32).

In her asylum application (Exh. 6-2 at 2) Ms. Fiadjoe stated, "[a]fter my parent's [sic] separation, I lived with my father and he began to sexually abuse me. This started when I was 7 years old." At her hearing (Tr. at 25) Ms. Fiadjoe testified, "[a]t the age of seven, he's tried to rape me and abuse me and beat me up and want me to be part of Trokosi, Trokosi." At the point in the hearing when the IJ had reduced Ms. Fiadjoe to tears and berated her for crying and "beating around bush" he asked her how long her father beat or raped her (Tr. at 32), to which she responded before dissolving into tears "[f]or, till I was seven, I know my father was raping me." There is no necessary inconsistency in these statements. Sexual abuse during a three months' period could plausibly include both attempted rape and rape. Moreover, it is unreasonable to expect a person to remember whether the repeated sexual abuse she suffered at age seven constituted attempted rape or actual rape. In the present case, in light of what followed in the ensuing years, any imprecision in this regard cannot rationally be a basis for an adverse credibility finding.

As to the inconsistencies in the statement before the Asylum Officer, the BIA decision stated:

> However, the respondent stated in a sworn statement before an asylum officer with the Immigration and Naturalization Service (now the Department of Homeland Security, DHS) that the abuse began approximately 3 years prior to her interview in 2000 (Exh. 6-9 at 4), when she would have been 26 or 27. In fact, she claimed in that interview that she never allowed her father to have sex with her (id.), in stark contrast to her later claims of on-going rape (Tr. at 27-28, 76, 78-79).

48

On March 30, 2000 Asylum Officer James L. Reaves conducted an Asylum Pre-Screening Interview. There can be no criticism of the manner in which he conducted the interview. He ensured that Ms. Fiadjoe had an interpreter in the Twi language. His questions were concise. There is every reason to believe that he, unlike the IJ, followed the INS Memorandum on Considerations for Asylum Officers Adjudicating Asylum Claims from Women, dated May 6, 1995.

With one exception, the answers Ms. Fiadjoe gave to him were fully consistent with her subsequent asylum application, her statements to Ms. Jansen and her hearing testimony. They included information about her family, her father's beatings, her flight from home, the murder of her fiancé, and her inability thereafter to find refuge with Aunt Dela's husband, her mother and stepfather and the friend in Accra. Ms. Fiadjoe's statement before Officer Reaves departed from her asylum application, the information she gave to Ms. Jansen and her hearing testimony in the following respect:

Q:   Have you ever been harmed in your country by anyone?
A:   Yes, by my father.
Q:   What did your father do to you?
A:   He abused me by beating me.
Q:   When did this happen?
A:   He started doing this about 3 years ago.
Q:   Did you live with him at that time?
A:   Yes, I was staying at home.
Q:   How long did this continue?
A:   This continued for 3 years, sometimes he tried to have sex with me.
Q:   Did you ever have sex with your father?
A:   No, I never allowed it.
Q:   When did this happen?
A:   It happened many times during the three

49

years.  When someone came to the house to marry me he would reject them.

Q:      When did this end?

A:      It never ended until I ran away from home.  He wanted me to marry an old man, I told him no.  A friend came over to my house.  I went to take a shower and when I returned the friend was dead.  I think my father killed my boyfriend.  He was 33 years old.

Q:      Did your father kill this young man?

A:      I was in the shower, when I came out my father was coming out of my room.  I don't know what he used to kill him.

To determine whether this discrepancy constitutes substantial evidence to support the IJ's and the BIA's adverse credibility determinations, it is necessary to examine the circumstances in which the statement was given.  Only nineteen days previously, March 11, 2000, Ms. Fiadjoe had arrived in this country traumatized by years of sexual oppression, the March 5 murder of her fiancé and a desperate but futile effort to find refuge from her father in Accra.  On her arrival at the airport she was questioned by an INS Officer and gave nonsensical answers.  For example, when asked why she left her home country she responded "I want to look after my mother."

It is established in this Circuit that inconsistencies between an airport statement and an asylum seeker's testimony before an IJ is not sufficient, standing alone, to support a BIA finding that the petitioner was not credible.  Balasubramanrim v. INS, 143 F.3d 157, 164 (3d Cir. 1998).

Such an interview is likely to be hurried; language difficulties arise; the results may be inaccurately recorded, and an arriving alien who has suffered abuse in his home country may be reluctant to reveal full information in his or her first meeting with the government. Id., at 162-3. As we stated in Senathirajah v. INS, 157 F.3d 210, 218:

> By placing too much reliance on an airport interview under the circumstances here, and ignoring more detailed accounts in Form 1-589 as well as testimony at an asylum hearing, the INS seriously undermined the reliability of the administrative process.

The Asylum Officer's interview of Ms. Fiadjoe was not conducted at the airport shortly after her arrival; it was conducted on March 30, 2002, approximately nineteen days later, at the York County Prison. Yet conditions similar to, and in many ways worse than, those at an airport interview prevailed. Ms. Fiadjoe was still in a state of shock resulting from the devastating experiences prior to March 11. Ms. Jansen described Ms. Fiadjoe's emotional state which existed at the time of the Asylum Officer's interview and thereafter until she had undergone counseling with Ms. Jansen:

> In the aftermath of her fiancee's murder, Ms. Fiadjoe was in a state of shock. She reports symptoms that are textbook acute psychological trauma. Without significant training in trauma psychology, she would be very unlikely to falsely report those symptoms much less describe them in the details as she and I have discussed them.

Finding herself in a strange place before a male officer it is not surprising that Ms. Fiadjoe would be unable to discuss the shameful and taboo incidents of incestuous rape. In both her letters Ms. Jansen described Ms. Fiadjoe's

51

emotional state when she first saw her and recounted that it was not until Ms. Fiadjoe had engaged in a number of therapy sessions that she was able to discuss fully, even with her, sexual abuses which her father had committed. Completely consistent with the INS Memorandum concerning considerations for adjudicating claims of women, Ms. Jansen wrote in her October 31, 2002 letter:

> It is extraordinarily difficult for sexual abuse victims to discuss specifics of their abuse experiences. Given the extreme shame that surrounds these issues in general they are difficult for both men and women to discuss. With the addition of the cultural factors surrounding Ms. Fiadjoe's experiences in particular, it should be of no surprise at all that she would be reluctant to discuss these issues with anyone, most specifically with a male or in the presence of several males.

Asked on cross examination why she had not informed the INS Officer about what had happened, Ms. Fiadjoe responded, "About sexual aspects, my father sleeping with me, I don't feel comfortable telling people . . .." The BIA considered none of these factors when rendering its decision.

As discussed above, the inconsistency in Ms. Fiadjoe's statement to the Asylum Officer is all that is left that reflects on Ms. Fiadjoe's credibility. None of the other reasons given by either the IJ or the BIA support an adverse credibility determination. By placing reliance on this interview under the circumstances in which it was taken and "ignoring more detailed accounts in Form 1-589 as well as testimony at an asylum hearing, the INS seriously undermined the reliability of the administrative process." Senathirajah, 157 F.3d at 218. Neither the IJ's nor the BIA's adverse credibility determination is supported by substantial evidence.

D. Government Protection: Under 8 U.S.C.

52

§1158(b)(1), the Attorney General may grant asylum to an alien who is a "refugee" within the meaning of 8 U.S.C. §1101(a)(42). Generally speaking, an applicant must show that he or she:

> is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of [the country of such person's nationality or in which such a person last habitually resided], because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . .

8 U.S.C. §1101(a)(42)(A). A showing of past persecution gives rise to a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. §1208. 13(b)(1).

To establish persecution, an alien must show past or potential harm rising to the level of persecution on account of a statutorily enumerated ground that is committed by the government or by forces the government is unable or unwilling to control. See Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002).

The BIA found that Ms. Fiadjoe's claim for asylum must be denied for failure to establish that the government of Ghana was either unable or unwilling to control her father's ritual sexual abuse. The BIA's evidential support for this finding is set forth in its entirety in a bare six lines of its decision:

> The respondent never sought the help of the authorities in Ghana (Tr. at 66). The respondent claimed that her grandmother told the police of the respondent's being beaten but that she declined to tell the authorities about the ritual sex abuse due to shame (Tr. at 29. The respondent submitted evidence that the government of Ghana outlawed Trokosi practice

53

and ritual bondage in 1998 and that a non-governmental organization has had success in liberating, counseling, and rehabilitating past victims of such bondage. (Exh. 6-5).

In the context of the record viewed in its entirety, these two snippets of information, both of them inadequately stated, do not constitute substantial evidence to support the BIA's finding that Ms. Fiadjoe has failed to establish that the government of Ghana was either unable or unwilling to control her father's ritual sexual abuse. The BIA totally ignored the evidence in the record that establishes the deep hold that the Trokosi religion has upon substantial elements of the Ghanian people. For example:

> Appalled by the practice, some Ghanians have broken the fearful silence which surrounds Trokosi. But their calls for it to be banned have had little impact on the centuries old tradition which has the blessing of some of Ghana's most powerful man. Jerry Rawlings, the country's charismatic if not exactly democratic, president - himself an Ewe - has spoken of Trokosi as an important part of Ghana's cultural heritage.

Booker, <u>Slave of the Fetish</u>, the Independent - London (June 16, 1996) (R. 363)[5].

---

[5] The dissenting opinion concludes that we have failed to accord proper deference to the BIA's finding on the issue of government protection in Ghana. The lengthy quotation from the State Department's 2000 Country Report on Human Rights Practices in Ghana to which the dissent refers does in fact set forth efforts of the government and human rights organizations to end the Trokosi practice, but the concluding portion of the quotation recites how ineffective the government efforts have been despite limited success

Nor is it easy to escape from Trokosi slavery. Speaking of his slaves, one Trokosi priest stated, "Their families wouldn't take them back. They're too afraid of angering the fetish."

The BIA was incorrect when it stated that "[t]he respondent never sought the help of the authorities in Ghana." Ms. Fiadjoe did seek such help through her grandmother who twice sought assistance from the police. It is true, as the BIA states, that the grandmother was too ashamed to mention the sexual aspect of the abuse, but the record is replete with evidence that the police would have done nothing even if they

_____

by NGOs:

> The Government has not prosecuted any practitioners of Trokosi and in August 1999, a presidential aide criticized anti-Trokosi activists for being insensitive to indigenous cultural and "religious" beliefs and practices. A local group, calling itself the "Troxovi Institutional Council" (Troxovi is an alternate spelling for Trokosi) declared that Trokosi, as defined by CHRAJ and other human rights groups to be a form of ritual servitude, does not exist in the country. The group claimed that the practice of "Troxovi" does exist but neither enslaves nor exploits anyone. The Council also listed 23 'genuine Troxovi shrines' in Ghana, describing them as educational institutions and as part of the "Afrikania religion." <u>The claims were widely refuted by chiefs, the press, and NGOs.</u>

AR:343-44 (emphasis added)

55

had been informed of that aspect of the abuse[6].

The most recent State Department Report covering Ghana shows how futile resort to the police would have been. Multiple pages are devoted to the brutality and corruption of the police and their refusal to prosecute sensitive crime, as Trokosi sexual practices certainly were, particularly in a village inhabited by believers in the sect. The Report notes that "[v]iolence against women, including rape and domestic violence remains a significant problem. A 1998 study revealed that particularly in low-income, high-density sections of greater Accra, at least 54 percent of women have been assaulted in recent years. A total of 95 percent of the victims of domestic violence are women according to data gathered by the FIDA. These abuses generally go unreported and seldom come before the courts. The police tend not to intervene in domestic disputes."

Ms. Fiadjoe's own experiences demonstrate that where a Trokosi slave is involved the police will not intervene. She had to flee to another country to escape from her father, where, unfortunately she was unable to stay. When she obtained her own room from a landlord in her neighborhood, her father so terrorized the landlord that he turned her out. Surely if the landlord had thought he could have obtained appropriate protection for himself and his tenant he would have turned to the public authorities. Similarly, when Ms. Fiadjoe fled to Accra after Ahmed's murder, her own mother did not dare to take her in, nor did her Aunt Dela's husband,

---

[6]    The dissent finds Fiadjoe's hearing testimony vague concerning what her grandmother told the police. When evaluating Ms. Fiadjoe's testimony it should be kept in mind that it was given during a hearing at which the IJ treated Ms. Fiadjoe with total insensitivity throughout, causing her to break down, become confused and ultimately to become reduced to silence. The BIA majority took no account of this factor.

nor did an old friend. The old friend was so frightened that the father would suspect that Ms. Fiadjoe had come to him that he removed her to a girlfriend's house, of which the father was presumably unaware, and assisted her in obtaining a false passport for flight out of the country. If the authorities were willing or able to protect this Trokosi slave none of this flight and fear would have been necessary[7].

The BIA selected two facts set forth in the State Department Report: i) "the government of Ghana outlawed Trokosi practice and ritual bondage in 1998" and ii) "a non-governmental organization has had success in liberating, counseling, and rehabilitating past victims of such bondage." (emphasis added). This selective use of the State Department Report is misleading and does not constitute substantial evidence.

In the first place, the BIA ignored other evidence in the record demonstrating continuation of Trokosi slavery and the government's unwillingness and inability to end it. The State Department Report itself confirms this continuation despite the 1998 legislation that banned "'customary servitude' (known as Trokosi)".

The Ghanian Constitution had for a long time prohibited such practices. "Every person has a right to personal liberty." Art. 14. "No person shall be held in slavery and servitude or be required to perform forced labor." Art. 16. These provisions had had no effect on the Trokosi cult. Similarly the 1998 legislation outlawing Trokosi has not succeeded in eliminating Trokosi slavery. While it is true that

_____

[7] These facts, along with much other evidence, totally negate the BIA's statement that "respondent implicitly admitted that she could escape her father's abuse by moving to an urban area." It is unnecessary to rule at this time that this finding also is not supported by substantial evidence because the BIA only advanced it in a hypothetical context.

certain organizations have succeeded in liberating and retraining approximately 2,800 Trokosi slaves, the 2001 State Department Report confirms that the practice remains very much alive:

> Trokosi, a traditional practice found among the Ewe ethnic group and in part of the Volta Region, is an especially severe human rights abuse and an extremely serious violation of children's and women's rights. It is a system in which a young girl, sometimes under the age of 10, is made a slave to a fetish shrine for offenses allegedly committed by a member of the girl's family. In rare instances, boys are offered. The belief is that, if someone in that family has committed a crime, such as stealing, members of the family may begin to die in large numbers unless a young girl is given to the local fetish shrine to atone for the offense. The girl becomes the property of the fetish priest, must work on the priest's farm, and perform other labors for him. Because they are the sexual property of the priests, most Trokosi slaves have children by the priests. Although the girls' families must provide for their needs such as food, most are unable to do so. There are at least 2,200 girls and women bound to various shrines in the Trokosi system, a figure that does not include the slaves' children. Even when freed by her fetish priest from the more onerous aspects of her bondage, whether voluntarily or as a result of intervention by activists, a Trokosi woman generally has few marketable skills and little hope of marriage and typically remains bound to the shrine for life by psychological and social pressure arising from a traditional belief that misfortune may befall a Trokosi woman's

58

family or village if she abandons her obligations to the shrine. When a fetish slave dies, her family is expected to replace her with another young girl, thus perpetuating the bondage to the fetish shrine from generation to generation.

Human rights organization are hopeful that ultimately Trokosi practices can be stamped out, but they persist, and Ms. Fiadjoe has to live in the present, not in a more hopeful future. Pertinent to the fact that she can expect no help from the government authorities is the following observation contained in the State Department Report but not addressed by the BIA: "The Government has not prosecuted any practitioners of Trokosi, and in August 1999, a presidential aide criticized anti-Trokosi activists for being insensitive to indigenous cultural and 'religious' beliefs and practices."

In light of Ms. Fiadjoe's own experiences and the documentary evidence in the record, we conclude that the BIA's finding that Ms. Fiadjoe failed to establish that the government of Ghana was either unwilling or unable to control her father's sexual abuse is not supported by substantial evidence[8].

## IV. **Conclusion**

The adverse credibility determinations of the IJ and of the BIA are not supported by substantial evidence, nor is the BIA's finding that Ms. Fiadjoe failed to establish that the government of Ghana was either unwilling or unable to control her father's sexual abuse supported by substantial evidence.

We will grant the petition for review and remand the case to the BIA for further remand to a different IJ for a new

---

[8] In light of the disposition of the case it is unnecessary to consider Ms. Fiadjoe's petition seeking review of the BIA's order denying her motion to reconsider its June 6, 2003 opinion.

hearing at which there may be received in evidence the documents that accompanied Ms. Fiadjoe's motion before the BIA for reconsideration of its June 6, 2003 decision and evidence, if available, of continuing Trokosi practices and governmental attempts to eradicate them and to protect Trokosi victims.

***Fiadjoe v. Ashcroft***, **Nos. 03-1971, 04-1544**

SMITH, *Circuit Judge*, dissenting:

While I would like to conclude otherwise, the majority's approach to its review of the BIA's findings concerning government protection in Ghana is, in my view, inconsistent with the deferential approach we are required to take in these cases. Accordingly, I must dissent.

Ms. Fiajdoe's is a tragic story. She does not present the typical claim for asylum, in which a refugee seeks protection from her native government or from forces acting on the government's behalf. Instead, she recounts a history of physical and sexual abuse suffered at the hands of her father, allegedly in connection with her father's activities as a traditional "Trokosi" priest. Though the grant of asylum has traditionally been used to protect immigrants fleeing government persecution, our laws are sensitive to the plight of individuals such as Ms. Fiadjoe. As the majority explains, a private incident that rises to the level of persecution can create eligibility for asylum when it is committed "by forces the government is either unable or unwilling to control." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). My difficulty with this case is that, try as I might, I cannot say - as the law requires us to say if we are to reverse the

61

BIA - that "any reasonable adjudicator would be compelled to conclude" that the Ghanaian government is unable or unwilling to control her father. I cannot say that here because there is what I consider to be ample evidence in the record to support the BIA's conclusion that, if the government had been informed of what Fiadjoe claims her father did, it would have been willing and able to control him. The majority sidesteps this evidence in favor of other information that may cast doubt on the efficacy of Ghana's anti-Trokosi efforts, and holds that the presence of such evidence compels an opposite conclusion than that reached by the BIA. It is simply not our charge to do that.[9]

To establish eligibility for asylum on the basis of past persecution, an applicant must show: "(1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily protected grounds; and (3) is committed by the government or *forces the government is either 'unable or unwilling' to control*." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) (emphasis added). Whether an

---

[9]Shortly before oral argument the government filed a motion indicating that Fiadjoe had left the United States and gone to Canada, and requested that her appeal be dismissed on the basis of the fugitive disentitlement doctrine. *See Arana v. INS*, 673 F.2d 75, 77 (3d Cir. 1982) (*per curiam*). Letter briefs filed after oral argument indicate that, while Fiadjoe apparently remains in Canada, she informed DHS through counsel that she has "self-deported," and in response to this information the government withdrew its motion to dismiss the appeal.

applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence standard. *See id.* Where an applicant seeks asylum based on private violence, whether the applicant's native government is willing and able to control the alleged persecutors is a component of the broader persecution inquiry. Thus, we must review the BIA's finding that Fiadjoe failed to show that the government of Ghana was unable or unwilling to control her father's abuse in order to determine if that finding is supported by substantial evidence.

In *Dia v. Ashcroft*, 353 F.3d 228 (3d Cir. 2003) (*en banc*), we elaborated on the nature of substantial evidence review of an asylum claim:

> Thus, the question whether an agency determination is supported by substantial evidence is the same as the question whether a reasonable fact finder could make such a determination based upon the administrative record. If a reasonable fact finder could make a particular finding on the administrative record, then the finding is supported by substantial evidence. Conversely, if no reasonable fact finder could make that finding on the administrative record, the finding is not supported by substantial evidence.

*Dia*, 353 F.3d at 249. We emphasized that our deference to the agency's findings is conditioned upon support in the record, and we indicated that if the agency's conclusion "is not based on a specific, cogent reason, but instead, is based on speculation, conjecture, or an otherwise unsupported personal opinion, we will not uphold it because it will not have been supported by such relevant evidence as a reasonable mind would find adequate. In other words, it will not have been supported by substantial evidence." *Id.* at 249-50.

The law requires applicants such as Ms. Fiadjoe to bear the burden of proof of establishing her eligibility for asylum. *See Gao*, 299 F.3d at 272; *Abdille v. Ashcroft*, 242 F.3d 477, 482 (3d Cir. 2001). The BIA found that Ms. Fiadjoe failed to carry this burden with respect to a critical element of her claim, namely, that she had experienced persecution by forces the government of Ghana was either unwilling or unable to control.

Our task in reviewing the BIA's finding is not to determine whether we would have reached the same conclusion in the first instance. To the contrary, "the substantial evidence standard of review is extremely deferential, setting a 'high hurdle by permitting the reversal of factual findings only when the record evidence would 'compel' a reasonable factfinder to make a contrary determination.'" *Chen v. Ashcroft*, 376 F.3d 215, 223 (3d Cir. 2004). We have further explained that for a petitioner to prevail on a challenge to the BIA's factual findings under the Immigration and Nationality Act ("INA"), "the

64

evidence [on the issue in question] must be so strong in [the petitioner's] favor that in a civil trial [the petitioner] would be entitled to judgment on the . . . issue as a matter of law." *See Chen*, 376 F.3d at 222 (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

Under this standard, I believe that the majority has failed to accord proper deference to the BIA's findings on the issue of government protection in Ghana. In concluding that Fiadjoe had not met her burden of proof, the BIA stated:

> The respondent never sought the help of the authorities in Ghana. The respondent claimed that her grandmother told the police of the respondent's being beaten but that she declined to tell the authorities about the ritual sexual abuse due to shame. The respondent submitted evidence that the government of Ghana outlawed Trokosi practice and ritual bondage in 1998 and that a non-governmental organization has had success in liberating, counseling, and rehabilitating past victims of such bondage. Therefore, the respondent has not shown that the government of Ghana would be unwilling or unable to protect her.

AR 74. The majority disagrees with the BIA's conclusions, but

in so doing it fails adequately to address the record evidence supporting the BIA's findings and places disproportionate emphasis on anecdotal statements culled from various portions of the record.

The majority quotes the description of Trokosi practices contained in the State Department's 2000 Country Report on Human Rights Practices in Ghana, which was also part of the record before the BIA. The paragraph immediately following the excerpt quoted by the majority details Ghana's anti-Trokosi efforts:

> In 1998 Parliament passed legislation that banned the practice of Trokosi in comprehensive legislation to protect women and children's rights. Human rights activists believe that the goal of eradicating the Trokosi practice is achievable with the new law. NGO's such as International Needs, and government agencies like the CHRAJ, have been campaigning against Trokosi for several years and are familiar with the locations of the fetish shrines and the numbers of women and children enslaved. Activists know the community leaders and fetish priests and, thus, know with whom to negotiate. The CHRAJ and International Needs have had some success in approaching village authorities and fetish priests at over 316 of the major and minor shrines, winning the release of 2,800 Trokosi slaves to

66

date and retraining them for new professions. The organizations continue to work for additional releases. The Government has not prosecuted any practitioners of Trokosi and in August 1999, a presidential aide criticized anti-Trokosi activists for being insensitive to indigenous cultural and "religious" beliefs and practices. A local group, calling itself the "Troxovi Institutional Council" (Troxovi is an alternate spelling for Trokosi) declared that Trokosi, as defined by CHRAJ and other human rights groups to be a form of ritual servitude, does not exist in the country. The group claimed that the practice of "Troxovi" does exist but neither enslaves nor exploits anyone. The Council also listed 23 'genuine Troxovi shrines' in Ghana, describing them as educational institutions and as part of the "Afrikania religion." These claims were widely refuted by chiefs, the press, and NGOs.

AR:343-44.

In light of this discussion, it is unclear to me how the majority can hold that no reasonable factfinder could conclude that the government of Ghana would be willing and able to help Fiadjoe. The fact that the Parliament passed comprehensive legislation to protect women and children's rights, and that the practice of Trokosi was banned pursuant to this legislation, certainly provides evidence that the Ghanaian authorities recognized the existence and nature of Trokosi and were willing

67

to take steps to combat it. The report's statement that "human rights organizations believe that the goal of eradicating Trokosi is achievable with the new law" also provides support for the BIA's conclusion that invoking the aid of Ghanaian authorities would not have been futile. There is no basis in the record to believe that these human rights organizations were offering anything less than an honest assessment of the situation, and if as of 2000 they reasonably believed Trokosi could be eradicated, then it is not for this Court to suggest that the BIA acted unreasonably in giving weight to their views.

The State Department report also recounts empirical evidence in support of the view that the Ghanaian government's anti-Trokosi efforts were having significant success. Specifically, Ghana's Commission for Human Rights and Administrative Justice ("CHRAJ"), working with an NGO, had secured the release of approximately 2,800 Trokosi slaves and retrained them for new professions. According to the State Department report, the CHRAJ is an autonomous government commission established pursuant to the Ghanaian constitution. Thus, contrary to the implications of the majority opinion, the State Department report indicates that Ghana's anti-Trokosi efforts were being implemented by a government agency acting in partnership with various NGOs. According to that report, this collaborative effort relied heavily upon negotiation rather than direct confrontation as a means of aiding the victims of Trokosi practices. By ignoring the CHRAJ initiative, the majority dismisses the BIA's findings concerning Ghana's anti-Trokosi

68

efforts, and wrongly equates the absence of criminal prosecution with an absence of effective aid for women threatened by Trokosi practices.

The majority also challenges the significance of the State Department's description of Ghana's anti-Trokosi efforts by quoting a portion of the report that addresses in a more general sense the problem of violence against women in Ghana. However, the concluding sentences of the paragraph quoted by the majority provide further support for the BIA's conclusion that Fiadjoe had not shown that the government of Ghana was unwilling or unable to protect her. The report states that 1998 legislation doubled the mandatory sentence for rape, and that in late 1998

> the police administration established a 'women and juvenile unit' to handle cases involving domestic violence, child abuse, and juvenile offenses. Located in Accra and Kumasi, the unit works closely with the Department of Social Welfare, FIDA, and the Legal Aid Board. During the year, the Accra Branch of this unit recorded over 530 cases, including 181 defilement cases, 35 rapes, 6 cases of incest, 17 indecent assualts, 86 instances of assault and wife battery, 6 abductions, and 200 neglect cases.

AR:341-42.  The majority does not recite this evidence, although it was part of the record before the BIA.  It reinforces my view that under the deferential substantial evidence standard, the record as a whole contains adequate support for the BIA's findings concerning the issue of government protection in Ghana.[10]

The majority also argues that Fiadjoe's own testimony shows that the government of Ghana would have been unwilling or unable to help Fiadjoe.  I do not believe Fiadjoe's testimony concerning her grandmother can bear the weight the majority places upon it.  Fiadjoe's affidavit and testimony are vague concerning what Fiadjoe's grandmother told the police, and the details that were allegedly provided could have left the police believing that Fiadjoe's situation involved a family dispute concerning excessive corporal punishment.

Fiajdoe's hearing testimony regarding this issue consists

_____

[10]In assessing the BIA's findings, the majority chastises the BIA for failing to address a June 1996 London newspaper article entitled "Slave of the Fetish."  This article was submitted by Fiadjoe's counsel during the proceedings below, and was part of the administrative record before the BIA.  However, this article predates by several years Ghana's anti-Trokosi efforts described in the 2000 State Department report discussed above, and it consists primarily of ambiguous statements that shed little light on whether Fiadjoe had met her burden of showing that the Ghanaian authorities were unwilling or unable to protect her.

70

of the following exchange:

Q. Okay, did you ever try to go to the police yourself to tell them what was happening to you?

A. No.

Q. Why not?

A. Because of how they were telling my grandmother.

Judge to Ms. Fiadjoe

Q. Because of what, ma'am?

A. Because they always tell my grandmother that he's discipline and my grandmother, I full of shame to tell anybody my father is sleeping with me.

AR:251. Fiadjoe's affidavit submitted in support of her asylum application contains slightly more detail:

14. My grandmother told the police about these beatings. My grandmother told me the police only said that 'your father is just trying to discipline you.'

15. In 1997 my grandmother went to the police after my father had poured boiling water on me when I refused to take his abuse. Again, the police said this was a father's right to discipline his children.

71

16. My [grand]mother did not tell the police that my father was sexually abusing me. It would shame our family and she could not do that.

AR:317-18.

In my view, particularly in light of the record evidence of Ghana's anti-Trokosi efforts, the limited information contained in Fiadjoe's affidavit and hearing testimony cannot reasonably be relied upon as determinative of what the Ghanaian authorities would have done had they been informed of Fiadjoe's father's Trokosi-related abuse. The majority acknowledges that the Ghanaian authorities were never informed of "the sexual aspect of the abuse," but fails to acknowledge the significance of this fact. The most that can be extracted from Fiadjoe's affidavit and testimony is that the local police failed to investigate when her grandmother twice told them that Fiadjoe was being physically abused by her father. However, Fiadjoe has not sought asylum simply because she was a victim of child abuse. Fiadjoe's brief, consistent with the requirements of the INA, argues that she was persecuted "on account of" her membership in a particular social group, which she defines as "Ghanaian women from the Ewe tribe in the Volta Region who have been subjected to or face being subjected to the practice of Trokosi and who oppose this practice." *See* 8 U.S.C. § 1101(a)(42)(A). Thus, it is specifically the sexual aspect of her father's abuse, combined with its ostensibly "religious" motivation, that has permitted Fiadjoe to seek asylum as one who has suffered persecution "on account of" a protected ground. It seems anomalous to hold, as the majority does, that Fiadjoe's native government would not protect her from persecution inflicted "on account of" her social group, when the Ghanaian government was not informed of Fiadjoe's membership in this social group

72

or of the nature and extent of the abuse that has given rise to her claim for asylum.[11]

Notwithstanding any shortcomings in Fiadjoe's testimony, I am willing to assume *arguendo* that a reasonable factfinder could rely on this testimony to conclude that Ms. Fiadjoe had shown that the government of Ghana was unwilling or unable to protect her. The majority, however, holds that a reasonable factfinder would be *compelled* to take this approach. Based on all of the record evidence discussed above, I simply cannot agree, and thus I believe it is inappropriate to invoke Fiadjoe's testimony as the basis for displacing the BIA's judgment with our own.[12]

Ms. Fiadjoe's account rightfully evokes our sympathies,

---

[11]I share the majority's concern with what appears from the transcript to have been the unnecessarily hostile demeanor of the IJ during Ms. Fiadjoe's hearing. However, the record as a whole supports the BIA's decision to accord limited weight to Fiadjoe's account concerning the interaction between her grandmother and the Ghanaian police. Ms. Fiadjoe's affidavit, prepared in advance of the hearing with the assistance of counsel, contains little detail concerning the specific information given by her grandmother to the Ghanaian police, and the affidavit acknowledges that the police were never informed of the alleged ritual sexual abuse that is the basis of Fiadjoe's claim for asylum.

[12]The majority also recounts Fiadjoe's testimony concerning her unsuccessful efforts to relocate away from her father, and asserts that "Ms. Fiadjoe's own experiences demonstrate that where a Trokosi slave is involved the police will not intervene." Maj. Op. 52. This statement on its face seems to me inconsistent with the majority's own acknowledgment that the Ghanaian authorities were never informed that Fiadjoe was a "Trokosi slave."

73

and I would be less concerned with the majority's approach if we had the luxury of deciding each case based solely on our own assessment of the facts underlying a petitioner's claim. However, that is not an approach we are permitted to take as an appellate court reviewing agency action, and I am concerned by the implications of the majority's approach for future immigration appeals. Our Court has little precedential authority evaluating asylum claims based upon alleged private persecution that a foreign government is purportedly unwilling or unable to control. I fear the majority's approach sets us down the wrong path for reviewing these difficult issues. By emphasizing only what it finds in the record to cast doubt on the effectiveness of Ghana's anti-Trokosi efforts, the majority overlooks or discounts the record evidence to the contrary. This approach risks a deluge of claims from applicants who have faced private violence and who can argue that a lack of resources constrains the effectiveness of law enforcement efforts in their native countries. It also raises the troubling specter of frequent judicial pronouncements condemning the law enforcement practices of foreign governments, an outcome our highly deferential standard of review is designed to avoid.

In my view, the majority's approach is effectively one of *de novo* review. The law forbids us from substituting our judgment for that of the BIA, and it provides no exception for cases where the BIA has had to address whether a foreign government would be willing and able to protect one of its own citizens.

I respectfully dissent.